**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

---

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § <br> § |
| **Plaintiff,** | § <br> § |
| vs. | § <br> § |
| **ARISEBANK,** <br> **JARED RICE SR., and** <br> **STANLEY FORD,** | § Civil Action No.: 3:18-cv-186-M <br> § <br> § <br> § |
| **Defendants.** | § <br> § |

---

## FIRST AMENDED COMPLAINT

Plaintiff Securities and Exchange Commission (the "SEC") files this First Amended Complaint against Defendants AriseBank, co-founder/CEO Jared Rice Sr., and co-founder/COO Stanley Ford (collectively "Defendants") and alleges the following:

## SUMMARY

1.      The SEC files this action to halt an ongoing, fraudulent, and unregistered offering of securities and to protect investors who are being actively defrauded.

2.      The fraud is being carried out by Defendants Jared Rice Sr. and Stanley Ford through Defendant AriseBank. AriseBank purports to be the world's first "decentralized" bank, allegedly offering a variety of consumer-facing banking products and services and supporting more than 700 different virtual currencies. Claiming to be "one of the largest cryptocurrency platforms ever built," AriseBank says it is "focused on bringing cryptocurrency to the average consumer and using it to revolutionize banking."

3.      AriseBank began raising money at least as early as November 2017, through a securities offering of AriseCoin—its own digital currency. AriseCoin is being offered in an

initial coin offering ("ICO") through which AriseBank claims that it has raised more than $600 million, with a goal of $1 billion. The ICO is scheduled to conclude on January 27, 2018, with AriseCoin to be distributed to investors on February 10, 2018.

4. The ICO is an illegal offering of securities because there is no registration statement filed or in effect with the SEC, nor is there an applicable exemption from registration. The AriseCoin ICO is a general solicitation that uses statements posted on the Internet and distributed throughout the world—including the United States. These marketing efforts include statements made through websites the Defendants control and through various social media accounts, video and radio interviews, and even a celebrity endorsement.

5. The ICO offering materials use many materially false statements and omissions to induce investment in the ICO. For example, AriseBank announced in a recent press release that it has purchased a 100-year-old commercial bank. The release stated that with the acquisition, AriseBank "can now offer its customers FDIC-insured accounts and transactions . . . ." This claim is false. FDIC records show that neither AriseBank nor the commercial bank it allegedly purchased has ever been an insured depository institution under the Federal Deposit Insurance Act.

6. The Defendants also made false statements about AriseBank's association with a payments processing platform through which AriseBank claims to offer an AriseBank-branded VISA card. Finally, the Defendants made materially false statements and omissions about the backgrounds and qualifications of key executives—most notably by failing to disclose Rice's criminal background.

7. By engaging in the conduct described in this First Amended Complaint, Defendants have committed, and unless restrained and enjoined will continue to commit,

violations of the registration and antifraud provisions of the federal securities laws. Because of the ongoing nature of the fraudulent offering and risk of asset dissipation, the SEC seeks emergency relief—including temporary restraining orders, asset freezes, and the appointment of a receiver over AriseBank.

## I.
## DEFENDANTS

8. AriseBank (a/k/a AriseBank Ltd and AriseBank Foundation, LLC) is an unincorporated entity with its principal place of business in Dallas, Texas.

9. Jared Rice Sr., age 29, is believed to be a resident of Dallas, Texas and is the CEO and co-founder of AriseBank.

10. Stanley Ford, age 45, purports to reside in Dubai, U.A.E, but has also resided in Dallas, Texas. He is the co-founder and Chief Operating Officer of AriseBank.

## II.
## JURISDICTION AND VENUE

11. The SEC brings this action under Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], seeking to restrain and enjoin the Defendants temporarily, preliminarily, and permanently from engaging in such acts and practices as alleged herein.

12. This Court has jurisdiction over this action under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Sections 21(e) and 27 [15 U.S.C. §§ 78u(e) and 78aa]. Each of the investments offered and sold as described in this First Amended Complaint is an investment contract and, therefore, a "security" as that term is defined under Securities Act Section 2(a)(1) [15 U.S. C. § 77b(a)(1)] and Exchange Act Section 3(a)(10) [5 U.S. C. § 78c(a)(10)].

13. AriseBank, Rice, and Ford, directly and indirectly, made use of the mails or of the means and instrumentalities of interstate commerce in connection with the transactions, acts, practices, and courses of business described in this First Amended Complaint.

14. Venue is proper because transactions, acts, practices, and courses of business described in this First Amended Complaint occurred within this federal district.

## III.
## FACTUAL ALLEGATIONS

### A. BACKGROUND ON DIGITAL TOKENS OR COINS

15. An ICO is a fundraising event in which an entity offers participants a unique "coin" or "token" in exchange for consideration (often in the form of crypto or fiat currency).

16. The tokens are issued on a "blockchain" or cryptographically secured ledger.[1]

17. Generally, coins or tokens may entitle holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights. These coins or tokens may also be listed on online platforms, often called virtual currency exchanges, and tradable for crypto or fiat currency. Often, the coins or tokens are immediately tradable.

18. ICOs are typically announced and promoted through public online channels.

---

[1] A blockchain is a type of distributed ledger, or peer-to-peer database spread across a network, that records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called blocks. Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain. The system relies on cryptographic techniques for secure recording of transactions. A blockchain can be shared and accessed by anyone with appropriate permissions. The Bitcoin blockchain is an example of a "non-permissioned," or public and open access blockchain. Anyone can download the Bitcoin open-source software and join. All participants share a single view of the Bitcoin blockchain, which is updated when Bitcoin network participants reach a consensus on the validity of transactions under review. "Permissioned" or private blockchains are modifications to that model and require permissioned servers to be approved to participate on the network or to access particular information on the blockchain. Blockchains or distributed ledgers can also record what are called smart contracts, which essentially are computer programs designed to execute the terms of a contract when certain triggering conditions are met.

Issuers usually release a "whitepaper" describing the project and the terms of the ICO. To participate, investors are generally required to transfer funds to the issuer's address, online wallet, payment processor, or other account. After the completion of the ICO, the issuer will distribute its unique coin or token to the participants' unique address on the blockchain.

19.     In some instances, the coins or tokens may continue to be sold by the original issuer after the ICO has completed. In others, they may only be obtained by purchasing them on secondary markets.

## B.     DEFENDANTS BEGIN MARKETING THE ICO

20.     On its website, www.arisebank.com,[2] AriseBank claims that it was founded in March 2017 by Rice and Ford. The company's initial plan was announced, and development began, in June 2017. In October 2017, AriseBank claims to have launched the AriseCoin ICO and a beta version of the banking platform. Although Defendants hold AriseBank out as a banking platform, on January 5, 2018, the Texas Department of Banking issued an Order to Cease and Desist Activity, prohibiting Defendants and their affiliates from implying that they engage in the business of banking in Texas.

21.     In or around October 2017, AriseBank issued an "Elevator Whitepaper," which is an abridged offering document authored and signed by Rice. The Elevator Whitepaper describes the AriseBank products in development and AriseBank's leadership team, and discusses a few pages about the AriseCoin ICO. AriseBank also distributed one or more versions of a longer Developer Whitepaper, signed by Rice and Ford, in November and December of 2017.

22.     AriseBank touts the AriseCoin ICO as the largest ICO ever launched. AriseBank claims that it completed its initial "Private Sale" of the ICO in two days in November 2017,

---

[2] Defendants also used the website www.arisecoin.com.

raising $1 million. After the Private Sale, AriseBank purportedly ran a Presale of the ICO, which it says raised $410 million by December 26, 2017.

23. The ongoing Public Sale began on or around December 26, 2017 and is set to last until January 27, 2018. AriseBank's website indicates that it will seek to raise as much as $500 million during the public sale. On January 18, AriseBank claimed in a press release that it had raised $600 million.

24. The arisecoin.com contribution page allows investors to purchase AriseCoin with U.S. dollars and a variety of virtual currencies, including Ethereum (ETH), Bitcoin (BTC), Litecoin (LTC), Dogecoin (DOGE), and NEM (XEM). The website does not prohibit investments from U.S. citizens or make any assessment of an investor's accreditation.

25. AriseBank lists the price of its AriseCoin, which it also refers to as ACO, as $1.40 per AriseCoin with 833,333,333 available to acquire. The price under the Presale was $1.20, with a 75 AriseCoin minimum purchase.

26. As a key part of its sales pitch, AriseBank claims that it has developed an algorithmic trading application, which it calls aIExchanger, that automatically makes trades in various cryptocurrencies. AriseBank alleges that aIExchanger will automatically make trades with funds in AriseBank customer accounts, generating daily profits. A portion of these profits will be paid to AriseCoin holders on a daily basis in the form of eACO. AriseBank describes eACO as a separate cryptocurrency from AriseCoin, and AriseBank touts it as the first expiring cryptocurrency: after receiving eACO, its holders have a limited period of time to spend it before it automatically expires. AriseBank claims that this forced circulation will increase the value of AriseCoin. AriseBank also takes a portion of the daily aIExchanger profits as a "broker fee."

27. In discussing how AriseBank will drive the increase of value of AriseCoin, the

Developer Whitepaper states:

> Our goal with AriseCoin is to drive overall circulation by incentivizing ACO holders to spend their extra rewarded eACO bonus coins before they expire. This causes eACO currency to be used rather than just held in static accounts, which in turns [sic] drives and grows the market value of AriseCoin economy and thus increase [sic] the value of ACO holdings.
> …
> AriseCoin works directly with the AriseBank Platform. In fact, they both work in concert with one another. AriseCoin is minted daily, based on the total gains from all AriseBank bank accounts. Those minted AriseCoins are then automatically distributed to AriseCoin wallet holders around the world, creating truly organic circulation, while also creating wealth distribution to everyone who's a part of the AriseCoin community.

And elsewhere it states that "eACO are minted on a daily basis, in proportion to the collective gains of AriseBank customers and are then algorithmically distributed back to all AriseCoin holders."

### C.  DEFENDANTS FAIL TO REGISTER THE ARISECOIN ICO WITH THE SEC

28. Federal securities laws require that companies disclose financial information through the registration of securities with the SEC. This information allows investors to make informed judgments about whether to purchase a company's securities.

29. The AriseCoin ICO is an offering of securities, which must be registered with the SEC unless an exemption applies. No such exemption applies here.

30. Neither AriseBank nor its AriseCoin are registered with the SEC in any way.

31. For the purpose of applicable exemptions, AriseBank's offering of AriseCoin through the AriseCoin ICO was not limited by size, geography, number of investors, or investor accreditation status.

32. Rice has made statements falsely claiming that Defendants and AriseCoin are not subject to regulation by the SEC. In early October 2017, Rice published a statement on Facebook and AriseBank.com, described in part as "a statement on our fight with the SEC."

Rice explains in the post that companies sell digital assets such as tokens "to gain investment via a self-established network of private investors."  After equating digital asset tokens with stock in a company, Rice mistakenly remarks that "a private company can issue private stock to ANYONE who wants to invest in their company and/or products without the SEC's involvement in any way."[3]  Rice declared that "[r]ather than close our ICOs and shiver in fear, companies like AriseBank have geared up for the coming fight with the SEC."

### D. DEFENDANTS MAKE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

33.  In addition to its failure to register the AriseCoin ICO, Defendants made false and misleading statements and omissions in its whitepapers, press releases, and other public statements.

34.  These statements and omissions were made in connection with the AriseCoin ICO, and Defendants obtained money or property by means of these statements.  And they made them knowingly, recklessly, or at a minimum negligently.

*The Defendants Falsely Claim Purchase of an FDIC-Insured Bank*

35.  In December 2017, AriseBank announced it was acquiring a 100-year-old FDIC-insured bank, with "hundreds of banking partnerships across the world and many certifications and licenses."  AriseBank continued to issue press releases on this topic through January 18, 2018, when it announced that it had completed the acquisition "and now holds 100 percent of the equity in both KFMC Bank Holding Company, a 100 year-old commercial bank."

36.  AriseBank touted the importance of this purported acquisition: "With the addition

---

[3] In a private Facebook conversation, however, Rice stated: "[ICO] tokens are shares, in reality.  They [sic] fall under the Hewy [sic] rules and the Hewy [sic] test.  [T]hey are [']investor contracts [sic]['']."  He also falsely claimed: "[T]he SEC sat me down last week and pre-audited us and the nerds got on my ass and said… [f***] the FBI/ [f***] the SEC[.]"

of the traditional bank[] AriseBank will now have an arm to comply with industry regulation and give its customers added confidence that even disruptive banking services offering cryptocurrencies will operate with the same assurance and consistency as those of a traditional bank. As part of this acquisition, AriseBank can now offer its customers FDIC-insured accounts and transactions."

37. As each Defendant knew, this statement is false. The FDIC has no record that either AriseBank or KFMC is FDIC-insured. Thus, neither may offer, or claim to be able to offer, FDIC-insured bank accounts.

38. The FDIC also has no record of any application for the change in ownership of an FDIC-insured bank or bank holding company involving AriseBank, KFMC, Rice, or Ford.

*The Defendants Falsely Claim to Offer an AriseBank-branded VISA Card*

39. AriseBank's Developer Whitepaper claims the company offers an AriseBank-branded VISA card that allows its customers to pay for goods and services using any of 700 different virtual currencies that they can hold in their AriseBank account. It also states that "Crypto in your Arise account is now instantly available on your AriseCard VISA."

40. AriseBank makes claims about the specific tools it uses to facilitate these cards. In its Developer Whitepaper, AriseBank claims that it provides the VISA card through a service named Marqeta, which was listed on its website as a "Partner": "Powered by Marqueta (sic) – AriseBank utilizes Marqueta's (sic) world renowned VISA API, allowing us to do things that most crypto wallets who have VISA cards are unable to do."

41. On its Facebook page, AriseBank announced on October 4, 2017, that "[o]ur new partnership with VISA and Marqeta has enabled the AriseCard and the entire AriseCard platform to change the very foundation of how we spend our money. From virtual to physical cards, the

AriseCard platform is directly compatible with …over 700 cryptocurrencies."

42. As each Defendant knew, AriseBank has no relationship with Marqeta. And after learning of these claims, Marqeta sent AriseBank a cease-and-desist letter and made public statements on Twitter that it did not have any relationship with AriseBank and did not provide programs that permit the spending of cryptocurrency.

*The Defendants Misled Investors About the Backgrounds of AriseBank Officers*

43. On its website and Facebook page and in its whitepapers, AriseBank identifies its executives and provides brief biographies for them. These biographies tout the credentials and credibility of these executives. They are misleading—omitting key information, including Rice's criminal background.

44. For instance, the Defendants tout Rice in the Elevator Whitepaper as a "futurist[] who envisioned the entire Arise-Bank and AriseCoin idea." Rice has also supposedly made "[y]ears of community contributions [. . .] contributing code under the MIT license." And he has supposedly performed "[y]ears of community work [. . .] working in the communities he made it out of and giv[ing] back frequently with projects like Dotemy."[4]

45. As the Defendants knew or were reckless in not knowing, Rice's biography was materially misleading, since it hid from investors that:

- Rice is currently on probation as a part of a plea deal stemming from a Collin County, Texas felony indictment in November 2015 for theft and tampering with government records.
- He is currently under felony indictment in Dallas County, Texas for assault, after which he allegedly destroyed evidence by stealing the victim's cell phone and deleting an audio recording of the incident.
- He is the subject of one or more unpaid civil judgments dating back to at least 2015.

---

[4] The other documents referenced in the previous paragraph contain similar statements about Rice.

46. In short, Rice is not the highly-competent professional and community activist Defendants held him out to be. The undisclosed information—which bears directly on his honesty, professional competence, and fair dealing as AriseBank's CEO—would have been highly material to investors, especially allegations concerning stealing and tampering with government documents and destroying evidence. The convictions and/or guilty pleas also impact the Defendants' ability to obtain licenses to own or operate financial institutions under restrictions imposed by the FDIC.

47. Finally, the Defendants lured investors into the scheme by distributing false or misleading biographical information about Kelvin Spencer, who they held out as AriseBank's President.[5]

48. Perhaps most notably, Spencer was never actively involved in AriseBank's operations. Instead, Rice—who Spencer knew and trusted from his days growing up in Dallas—fraudulently used Spencer's name, likeness, and biography to mislead investors about the legitimacy of AriseBank.

49. For instance, in the Developer Whitepaper, the Defendants falsely stated:

- Kelvin has "worked closely with the CEO and founders of AriseBank for the past decade." Spencer did not work with Rice for the past decade and was only in sporadic contact with him over that period. And he has never met Stanley Ford, the other Co-founder.
- Kelvin has "sold many lucrative software companies." While Spencer has sold some software programs, he has never sold a software company.
- Kelvin has "made several million dollars off of Bitcoin and Ethereum assets, by creating his own auto-trading algorithm that he utilized on multiple trading exchanges

---

[5] The SEC's original Complaint contained the erroneous allegation that Spencer has a criminal history. That is not the case. Having filed this case on an emergency basis, *ex parte* and under seal, SEC counsel first realized the error by speaking with Spencer after the case was unsealed. Upon speaking with him, SEC counsel determined that the prior criminal conduct alleged in the original complaint relates to another person with the same name and similar identifying characteristics. SEC counsel greatly appreciates Mr. Spencer's assistance in correcting its mistake and apologizes to him for it.

   like GDax."  While Spencer wrote some programs to trade cryptocurrencies in his free time, he has not made significant profits trading—much less millions of dollars.
- "Kelvin [. . .] works day to day with the CEO and COO to bring new products and partnerships."  Spencer did not work day to day with Rice or Ford, nor was he involved in new products or partnerships.
- "Kelvin [. . .] will head the aEX and aiExchanger."  Spencer never did any work on aEX or aiExchanger.
- "Kelvin [. . .] is helping to grow one of the best blockchain developer teams in the industry."  Spencer did not have a blockchain developer team.

## IV.
## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Unregistered Offers and Sales of Securities
### Violation of Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)]
### (All Defendants)

50.  The SEC incorporates the allegations in paragraphs 1 through 46 of this First Amended Complaint by reference as if set forth verbatim in this Claim.

51.  By engaging in the conduct described above, Defendants, directly or indirectly, singly or in concert with others, (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of written contracts, offering documents, prospectus, oral and written statements, or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities as to which no registration statement was in effect; or (iii) made use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of written contracts, offering documents, prospectus, oral and written statements, or otherwise, securities as to which no registration statement had been filed.

52.  For these reasons, Defendants have violated, and unless restrained and enjoined,

they will continue to violate Sections 5(a) and (c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## SECOND CLAIM FOR RELIEF
### Fraud in the Offer or Sale of Securities in
### Violation of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)]
### (All Defendants)

53. The SEC re-alleges and incorporates paragraphs 1 through 46 of this First Amended Complaint by reference as if set forth verbatim in this Claim.

54. By engaging in the conduct described above, Defendants directly or indirectly, singly or in concert with others, in the offer or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails, and at least negligently, have obtained money or property by means of untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

55. Defendants knew or should have known that they obtained money or property by means of untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

56. For these reasons, Defendants have violated and, unless enjoined, will continue to violate Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

## THIRD CLAIM FOR RELIEF
### Fraud in Connection With the Purchase and Sale of Securities
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b)]
### (All Defendants)

57. The SEC re-alleges and incorporates paragraphs 1 through 46 of this First Amended Complaint by reference as if set forth verbatim in this Claim.

58. By engaging in the conduct described above, Defendants, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails, have made untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

59. Defendants made the above-referenced untrue and misleading statements knowingly or with severe recklessness.

60. For these reasons, Defendants violated and, unless enjoined, will continue to violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)].

**FOURTH CLAIM FOR RELIEF**
**Aiding and Abetting Violations of Sections 5(a) and (c) and 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder**
**(Rice and Ford)**

61. The SEC re-alleges and incorporates paragraphs 1 through 46 of this First Amended Complaint by reference as if set forth verbatim in this Claim.

62. By engaging in the conduct described above, Defendants Rice and Ford knowingly or recklessly aided and abetted, pursuant to Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act:

- (i) the use of means or instruments of transportation or communication in interstate commerce or of the mails to sell, through the use or medium of written contracts, offering documents, prospectus, oral and written statements, or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by means

          or instruments of transportation, securities as to which no registration statement was in effect; or (iii) use of means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of written contracts, offering documents, prospectus, oral and written statements, or otherwise, securities as to which no registration statement had been filed.

- in the offer or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails, the obtaining of money or property by means of untrue statements of a material fact and omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

- in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce or by use of the mails, the making of untrue statements of a material fact and omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading

63. For these reasons, Defendants Rice and Ford aided and abetted violations of, and, unless enjoined, will continue to aid and abet violations of Securities Act Sections 5(a), 5(c) [15 U.S.C. § 77e(a) and (c)] and 17(a)(2) [15 U.S.C. § 77q(a)(2)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5(b)].

## V.
## RELIEF REQUESTED

WHEREFORE, the SEC respectfully requests that the Court:

1. Preliminarily and permanently enjoin Defendants from violating Securities Act

Sections 5(a) and (c) and 17(a)(2) and Exchange Act Section 10(b) and Rule 10b-5(b) thereunder;

    2.    Preliminarily and permanently enjoin Defendants Rice and Ford from participating in an offering of digital securities;

    3.    Prohibits Defendants Rice and Ford, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered under Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

    4.    Order Defendants to each disgorge ill-gotten gains and benefits obtained or to which they were not otherwise entitled, as a result of the violations alleged herein, plus prejudgment interest on that amount;

    5.    Order Defendants to each pay a civil money penalty in an amount determined by the Court under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)] for the violations alleged herein; and

    6.    Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

    7.    Order such other relief as this Court may deem just, proper, and equitable.

Dated:  February 2, 2018                    Respectfully submitted,

                                                *s/ Timothy L. Evans*
CHRIS DAVIS
Texas Bar No. 24050483
TIMOTHY L. EVANS
Texas Bar No. 24065211
B. DAVID FRASER
Texas Bar No. 24012654

United States Securities and Exchange Commission
Fort Worth Regional Office
Burnett Plaza, Suite 1900
801 Cherry Street, Unit #18
Fort Worth, TX 76102-6882
Ph: 817-900-2638 (CD)
Fax: 917-978-4927
*davisca@sec.gov*
*evanstim@sec.gov*
*fraserb@sec.gov*

ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION

### **CERTIFICATE OF SERVICE**

I hereby certify that on February 2, 2018, I caused a true and correct copy of the foregoing *First Amended Complaint* to be served on all Defendants in and parties to this lawsuit, in accordance with the Federal Rules of Civil Procedure.

                                                *s/ Timothy L. Evans*
Timothy L. Evans